IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**JACQUELINE K. WILLIAMS,**       )
                                          )
             **Plaintiff,**      )
                                          )
**vs.**                                    )     **Case No.** 13-cv-999-CJP[1]
                                          )
**CAROLYN W. COLVIN,**        )
**Acting Commissioner of Social**   )
**Security,**                        )
                                          )
             **Defendant.**     )

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Jacqueline K. Williams is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).

## Procedural History

Plaintiff applied for SSI in July, 2010, and DIB in August, 2010. In both applications, she alleged disability beginning on September 25, 2008. (Tr. 13). After holding an evidentiary hearing, Administrative Law Judge (ALJ) Anne Sharrard denied the application in a decision dated May 2, 2012. (Tr. 13-33). Plaintiff's request for review was denied by the Appeals Council, and the decision

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  See, Doc. 14.

of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have

been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ failed to incorporate all of plaintiff's limitations into her RFC evaluation and therefore presented an inaccurate hypothetical to the vocational expert.

2. The ALJ failed to properly consider plaintiff's subjective complaints of pain and mental health symptoms and therefore erred in her credibility determination.

### Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the

applicable statutes.[2]   For these purposes, "disabled" means the "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from

anatomical, physiological, or psychological abnormalities which are demonstrable

by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C.**

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

**§423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, **649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520;** *Simila v. Astrue,*

**573 F.3d 503, 512-513 (7th Cir. 2009.**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, **737 F.2d 714, 715 (7th Cir. 1984)**.  *See also Zurawski v. Halter*, **245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,** *Books v. Chater*, **91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater*, **55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined "substantial evidence" as "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **91 S. Ct. 1420, 1427 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Sharrard followed five-step analytical framework described above. She determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date. She found that plaintiff had severe impairments of psoriasiform dermatitis, mild mid-cervical spondylosis and minimal C4-5 spinal stenosis, right L2 radiculopathy, general anxiety disorder, depression disorder not otherwise specified, agoraphobia with obsessive compulsive disorder features, dysthymic disorder, eating disorder not otherwise specified, chronic post-traumatic stress disorder, and borderline personality disorder. (Tr. 15). She further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level, with limitations. (Tr. 18). Based on the

5

testimony of a vocational expert (VE), she determined plaintiff could not perform her past work, but could perform other jobs which exist in significant numbers in the national and local economy. (Tr. 13-33),

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff.

### 1. **Agency Forms**

Plaintiff was born on December 6, 1971 and was 37 years old at her alleged onset of disability.  (Tr. 176). A previous application had been denied in 2003. (Tr. 177). She was insured for DIB through December 31, 2013. [3] (Tr. 176).

Plaintiff said she was unable to work due to major depression, anxiety disorder, a back injury, arthritis, migraines, post-traumatic stress disorder, separation anxiety disorder, anorexia and bulimia, and a skin rash. She was 5'2" and weighed 100 pounds. (Tr. 180). Plaintiff completed high school but had no specialized training. In elementary school she attended special education classes. She previously worked as a day care provider, dishwasher and side cook, and hand packer. (Tr. 181).

Plaintiff completed Function Reports in September 2010 and January 2011. (Tr. 203-13, 236-48). She stated she had severe anxiety that caused panic attacks daily. (Tr. 203). She took care of her children and was able to fix simple

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI.  See, 42 U.S.C. §§ 423(c) & 1382(a).

meals. (Tr. 205). She only showered two times per week due to her problems with severe psoriasis. (Tr. 204).

Plaintiff took care of basic cleaning needs around the home but could not vacuum or sweep. (Tr. 236). She said she had trouble concentrating and staying on task due to her anxiety. (Tr. 208, 240). Additionally, she stated that driving or paying bills may cause her to have panic attacks. (Tr. 206, 240). She could walk for one block and needed fifteen minutes rest after due to her back pain. (Tr. 240). Plaintiff reported that several of her medications caused her to be drowsy or dizzy. (Tr. 210, 243).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on April 3, 2012. (Tr. 52). She testified that her husband was incarcerated, and she lived with her mother and children in an apartment. Her mother helped pay for bills. (Tr. 59).

Plaintiff stated she had been diagnosed as anorexic since the age of thirteen and did not enjoy food. She only gained weight when she was pregnant or on prednisone. (Tr. 58). She testified to working full-time for the past six or seven years at a daycare. She worked on and off as a part-time kitchen helper from 1997 until 2007. (Tr. 60-1). Since the late 1990s, plaintiff had worked several different jobs for one or two months. (Tr. 60-3).

She stopped working in the daycare due to complications with her back and tailbone. (Tr. 64). She also testified that her legs were weak, her left side

frequently went numb, she had migraines, and her right arm and chin shook often. (Tr. 65). Plaintiff took amitriptyline for her migraines but it did not always alleviate her symptoms and the dosage was frequently adjusted. (Tr. 65-6). She stated she saw a neurologist, Dr. Collins, for treatment of her migraines. (Tr. 65).[4]

Plaintiff had severe psoriasis that caused her skin to hurt and her hair to fall out. She testified that the skin on her head, face, neck, chest, arms, legs, and toes were affected by the psoriasis. (Tr. 66). Her skin condition caused her to have flu-like symptoms if she spent even just a few minutes in the sun or the cold. (Tr. 67-8). The rash would also cause her to shake and be unable to sit up straight or put pressure on her back. Plaintiff claimed her fingers would cramp and she was unable to hold anything for even a few minutes. (Tr. 68-9). Plaintiff had cervical spinal stenosis but testified that she did not have a problem with it until the rash appeared on her neck. (Tr. 70). She stated her rash does not come and go and it either stays the same or gets worse. (Tr. 70-1).

Plaintiff took several medications for her various ailments including Albuterol, Amitriptyline, Clobetasol, Diclofenac, Duranex, Enbrel injections, Hydrocodone, and Protopic. (Tr. 71-2). She testified that the medications for her skin condition did not alleviate her symptoms, but every two weeks she switched creams with the hope that one would eventually help. On a scale of one to ten, on a typical day plaintiff rated her pain as a seven before she took her medications and a five after. (Tr. 73).

---

[4] The Court notes that no treatment history from Dr. Collins is on record.

Plaintiff stated she had panic attacks "all the time" and used to attend counseling. When her counselor moved she stated that she did not feel comfortable with the new counselor so she stopped attending sessions. (Tr. 76-77). One of plaintiff's doctors put her on several medications for her psychiatric impairments but plaintiff felt they made her unable to function so she stopped taking them. (Tr. 78). She was on a Nicotrol inhaler to stop smoking and she felt it was working. (Tr. 80). Plaintiff testified to being able to sit for ten to fifteen minutes, stand for ten minutes with help, and walk for twenty to twenty-five feet. (Tr. 80-1). She stated that she had a walker prescribed for her to help her ambulate. (Tr. 81).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history that was able to do light work but must avoid even moderate exposure to extreme cold and extreme heat. Additionally, the person would be limited to simple, routine, and repetitive tasks, would have to do a low stress job with only occasional changes in work setting, and could only have brief and superficial interactions with co-workers and the general public.

The VE testified that the person would be unable to perform any of plaintiff's previous work. However, the person could do jobs that exist in significant numbers in the national economy. Examples of such jobs are housekeeper, cleaner or polisher, and buffing machine tender. (Tr. 94-103).

**3. Medical Treatment**

Plaintiff had minimal treatment notes prior to 2010. In July 2008, plaintiff saw her primary care providers, Dr. Sherri Howell and a nurse practitioner Jan Stierwalt, twice complaining of eye pain. They prescribed a medication and discussed hand washing techniques. (Tr. 275-9). In September 2008, plaintiff presented to a chiropractor complaining of back pain caused by a four-wheeling accident two years prior. (Tr. 268). She reported backaches, headaches, and low back pain. (Tr. 269).

In July 2010, plaintiff presented to Dr. Howell with anxiety and complained of daily panic attacks primarily due to her husband being in prison. Dr. Howell referred her to a counseling service and prescribed Clonazepam. (Tr. 284). Throughout her treatment of plaintiff, Dr. Howell and Ms. Stierwalt changed plaintiff's antidepressant prescription several times to help alleviate her anxiety. (Tr. 284, 287, 362, 428, 537). However, at times plaintiff would not properly follow the instructions for her prescriptions or would stop taking them entirely. (Tr. 312, 362, 428).

In July 2010, plaintiff had her first evaluation with her counselor, Megan Crites, at Cumberland Associates. (Tr. 291-304). Ms. Crites opined that plaintiff had average intellectual functioning and no problems with personal care or activities of daily living. She determined that plaintiff's main problem was panic attacks and diagnosed her with generalized anxiety disorder and adjustment disorder, NOS. (Tr. 385). She assigned plaintiff a GAF[5]  score of 50 and developed

---

[5] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and

a specified treatment plan for plaintiff. (Tr. 306-313). In October 2010, plaintiff had an additional psychiatric evaluation performed by Dr. Archana Copra of Cumberland Associates. He diagnosed plaintiff with anxiety and depression and assigned her a GAF score of 45-48. (Tr. 387-89).

In August 2010, plaintiff began attending regular counseling sessions with Ms. Crites. (Tr. 291-304). She frequently complained that she was overwhelmed and anxious, primarily due to family problems. (Ex., Tr. 307, 334, 338, 442-43). Ms. Crites helped plaintiff develop appropriate communication skills and strategies to help with her anxiety. (Ex, Tr. 338, 340, 447, 449, 454). In March 2011, Ms. Crites noted that plaintiff was having trouble deciding if she should go back to work or wait to hear if she was approved for SSI. (Tr. 444).

While plaintiff made progress with goals that Ms. Crites set for her, she continually reported that she had trouble dealing with stress and decision making. (Ex., Tr. 440, 444, 466, 475). In May 2011, plaintiff had her last treatment with Ms. Crites where she stated that plaintiff was stressed and had made small progress on her goals. (Tr. 440). After her last treatment, the only medical note regarding depression in plaintiff's record is a follow up with Ms. Stierwalt where plaintiff stated her medications were helping. (Tr. 432).

Plaintiff first complained of problems with her skin in July 2010. She told Dr. Howell that she had a rash for at least thirteen years on her nose but that it had

---

occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* - Fourth Edition, Text Revision 32-33 (4th ed. 2000); Although the American Psychiatric Association recently discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

recently spread to her arms. Dr. Howell told plaintiff to stop using creams, limit her bathing to three times a week, and only use mild soaps. (Tr. 284). This did not alleviate her symptoms and in 2011 plaintiff began seeing a physician assistant, Warren Lee, at a dermatology office. (Tr. 491).  Mr. Lee performed tests on plaintiff's skin lesions and diagnosed her with lichen simplex dermatitis and chronic eczema. (Tr. 492).

Throughout 2011 and 2012, plaintiff often complained that the problems with her skin were getting worse. (Tr. 428, 595, 530, 528, 580, 584, 645). She was given prescriptions, ointments, and told to use a tanning salon for sun therapy. (Tr. 494, 577, 584, 589, 645). Mr. Lee reported that some of the treatments were working and plaintiff was doing better. (Tr. 494, 572). However plaintiff stopped using the medications and her skin conditioned worsened. (Tr. 572). She reported that the lesions on her skin spread from her head to her feet and that her hair was falling out as a result. (Tr. 530, 565, 589, 645). In March 2012, Mr. Lee had more tests performed. His last treatment notes indicated her skin problems appeared to be caused by discoid lupus and he was referring her to a rheumatologist. (Tr. 649).

Plaintiff also occasionally presented with back and leg pain. (Tr. 426, 482, 540, 536, 529, 514). In August 2011, plaintiff had an MRI of her lumbar spine that revealed only mild early degenerative changes at the facets of the lower lumbar spine and no stenosis. (Tr. 563). In September, she had two MRIs performed. The MRI of her thoracic spine showed no significant degenerative

changes with maintained alignment and no acute disc pathology, scattered small vertebral body hemangiomas, and a normal thoracic spinal cord signal. (Tr. 557). The MRI of her cervical spine revealed mild mid cervical spondylosis with small C4-C5, C5-C6 disc protrusions and minimal C4-C5 spinal stenosis. (Tr. 558). That month she also had an EMG that revealed right L2 radiculopathy. (Tr. 562). Plaintiff took hydrocodone for the pain and used crutches to help her walk. (Tr. 536).

In August 2011, Ms. Stierwalt completed a medical source statement. (Tr. 496-500). While she wrote that emotional factors did not contribute to plaintiff's symptoms and limitations, plaintiff's anxiety did affect her pain. (Tr. 496-97). Ms. Stierwalt opined that plaintiff had a severe limitation with her ability to deal with work stress and that her pain would frequently be severe enough to interfere with her attention and concentration. Ms. Stierwalt felt plaintiff could sit for less than fifteen minutes continually and for a total of one hour a day, and could stand or walk for a maximum of fifteen minutes continually and for a toal of one hour a day. (Tr. 497-98). Plaintiff would need additional breaks and would need to lie down for five hours a day. (Tr. 498-99). Plaintiff could never use her left or right hand to handle objects and could only occasionally reach. (Tr. 499).

### 4. RFC Assessment

Phyllis Brister, Ph.D., performed a mental RFC assessment in November 2010. (Tr. 404-406). She found plaintiff to be moderately limited in her ability to understand, remember, and carry out detailed instructions, work in coordination

with or proximity to others without being distracted by them, interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting or exhibiting behavioral extremes. (Tr. 404-5). Dr. Brister opined that plaintiff had the ability to adapt to routine changes. Additionally, plaintiff was capable of simple substantial gainful employment. (Tr. 406).

No physical RFC evaluation was performed. However, state agency physician Dr. Richard Smith reviewed plaintiff's record and determined she had no more than minimal limitations in her ability to function. (Tr. 638). These opinions were affirmed by state agency reviewing physicians Dr. Towfig Arjmand and Dr. Jason Mehr in 2011. (Tr. 642).

### 5. Consultative Examinations

On November 2, 2010 plaintiff underwent a psychiatric consultative examination by Jerry Boyd, Ph.D. (Tr. 410-15). Plaintiff was alert and oriented but her attention, concentration, and short-term memory showed mild impairment. She made no errors on simple calculations but declined serial sevens. Dr. Boyd opined that plaintiff's intelligence seemed to be in the low average range, her judgment and maturity were slightly below age level, and her insight was superficial. (Tr. 411). Dr. Boyd opined that plaintiff appeared to have reduced stress tolerance, particularly for interpersonal settings and had reduced persistence in association with depression and anxiety. He felt plaintiff could manage her own funds. (Tr. 413). Dr. Boyd's diagnostic impressions were

agoraphobia with OCD features, dysthymic disorder, eating disorder NOS, chronic post-traumatic stress disorder, and borderline personality disorder. He assigned plaintiff a GAF score of 55. (Tr. 412).

Plaintiff also underwent a physical consultative examination by Dr. Vittal Chapa on November 2, 2010. (Tr. 416-18). Dr. Chapa opined that plaintiff's gait was normal and she was able to ambulate without the assistance of any aids. (Tr. 417). Plaintiff had full range of motion and her motor strength was a 5/5 in both upper and lower extremities. She had no difficulty getting on and off of the exam table. Dr. Chapa's diagnostic impression was vague muscle pains. (Tr. 418).

## Analysis

Plaintiff first argues that the ALJ failed to incorporate all of her limitations into her RFC assessment and therefore presented an inaccurate hypothetical to the vocational expert. As plaintiff relies significantly on her subjective complaints, the Court will first consider her second argument regarding the ALJ's credibility analysis.

Plaintiff contends that the ALJ failed to properly consider plaintiff's subjective complaints of pain and mental health symptoms and therefore made an erroneous credibility determination. It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, **207 F.3d 431, 435 (7th Cir. 2000).** "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's

testimony on the basis of the other evidence in the case." ***Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006).**

The ALJ is required to give "specific reasons" for her credibility findings and to analyze the evidence rather than simply describe the plaintiff's testimony. ***Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).** See also, ***Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)**(The ALJ "must justify the credibility finding with specific reasons supported by the record.") The ALJ may rely on conflicts between plaintiff's testimony and the objective record, as "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." ***Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).** However, if the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. ***Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).**

Additionally, SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3

Plaintiff argues that the ALJ failed to consider plaintiff's subjective complaints of pain appropriately. However, the ALJ acknowledged plaintiff's description of her back pain, skin problems, and mental impairments. She also looked through the record and determined plaintiff's complaints were not entirely

supported by the evidence. She discussed plaintiff's credibility in detail and assessed each factor of SSR 96-7p.

The ALJ first explained how many of plaintiff's subjective complaints were not supported by objective medical testing. She noted that plaintiff's consultative examination with Dr. Chapa was completely normal. Plaintiff had full range of motion in all joints, and she had no specific motor weakness or muscle atrophy. (Tr. 21, 416-18).  The ALJ acknowledged results from medical testing that were indicative of problems, such as her radiculopathy and minimal stenosis, but she noted that most of the findings from plaintiff's x-rays, CT scans, MRIs, and nerve studies were minimal. (Tr. 22-23).

The ALJ recognized that plaintiff's skin problems had gotten worse but that her treatment notes did not support the severe symptoms she alleged as she had occasional improvement and was not consistent with her medications. (Tr. 23-5). ALJ Sharrard also extensively looked at plaintiff's treatment history for her mental impairments. (Tr. 25-28). She noted that plaintiff's mental impairments were the bulk of her complaints in 2010. However, plaintiff had not complained about her mental health problems to her physicians since she stopped treatment in 2011. (Tr. 28).

The Seventh Circuit has held that an ALJ cannot disregard a plaintiff's subjective complaints of pain, but "may view discrepancies within the medical record as probative of exaggeration." **Knox v. Astrue, 327 Fed. Appx. 652, 655 (7th Cir. 2009).** The ALJ pointed out several inconsistencies within plaintiff's

testimony and written statements. For example, plaintiff stated her skin problems never lessened but treatment notes indicated that certain creams helped. (Tr. 31). Plaintiff testified that Ms. Stierwalt took her off of all psychiatric medications. However, Ms. Stierwalt's notes indicate she had her resume taking Celexa. (Tr. 31, 428). The ALJ noted that plaintiff was not consistent with her medications and even changed the dosages on her own, even though her records indicate that the medications were helping. (Tr. 31). The ALJ stated that plaintiff's records indicate very little treatment history prior to 2010 and her alleged onset date is unsupported. (Tr. 24).

ALJ Sharrard looked at plaintiff's activities of daily living. The Seventh Circuit has held that this is appropriate to consider when evaluating credibility but that it should be done with caution. *Roddy v. Astrue*, **705 F.3d 631 (7th Cir. 2013).** She determined plaintiff's activities were not indicative of someone with the disability plaintiff claimed, as plaintiff took care of herself, prepared meals, took care of her children, and could drive and shop. The ALJ felt plaintiff's complaints did not support the ability to perform these tasks. (Tr. 30).

She also looked at plaintiff's work history. Plaintiff had a sporadic work history prior to her alleged onset date and the ALJ determined this worked against her credibility. (Tr. 31). The Seventh Circuit has held that sporadic work history and declining earnings prior to the alleged onset date may show a lack of effort to find work and diminish a claimant's credibility. *Simila v. Astrue*, **5730 F.3d 503, 520 (7th Cir. 2009).** Additionally, the ALJ noted plaintiff's treatment

records with her counselor stated twice that plaintiff was unsure if she should go back to work or wait to hear if she received disability. The ALJ felt this was indicative that her ability to work was greater than she reported. (Tr. 30).

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." *Simila v. Astrue*, **573 F.3d 503, 517 (7th Cir. 2009).** The analysis is deemed to be patently wrong "only when the ALJ's determination lacks any explanation or support." *Elder v. Astrue*, **529 F.3d 408, 413-414 (7th Cir. 2008).** Additionally, not all of the ALJ's reasons have to be sound as long as enough of them are. *Halsell v. Astrue*, **357 Fed. Appx. 717 (7th Cir. 2009).** Here, the analysis is far from patently wrong and enough of the ALJ's reasons were sound. ALJ Sharrard considered the relevant factors and supported her conclusion with reasons derived from evidence. See, SSR 96-7p. She built the required logical bridge from the evidence to her conclusions about plaintiff's testimony and therefore her credibility determination stands. *Castile v. Astrue*, **617 F.3d 923, 929 (7th Cir. 2010).**

Next this Court turns to plaintiff's arguments regarding the ALJ's RFC assessment. Plaintiff argues that the ALJ erred in the hypothetical she presented to the VE by not incorporating greater limitations and created an inaccurate RFC as a result.

An RFC is "the most you can still do despite your limitations."  20 C.F.R. §1545(a).  In assessing RFC, the ALJ is required to consider all of the claimant's "medically determinable impairments and all relevant evidence in the record."

*Ibid*.   Obviously, the ALJ cannot be faulted for omitting alleged limitations that are not supported by the record. Plaintiff first argues that the ALJ's non-exertional limitations failed to incorporate all of plaintiff's mental health limitations. She cites a number of Seventh Circuit cases where the hypothetical presented to a VE was determined to be insufficient for failing to include additional limitations regarding mental impairments.

The first case she cites is *Young v. Barnhart*, **362 F.3d 995 (7th Cir. 2004).** In *Young*, the claimant was in a motorcycle accident that resulted in plaintiff being in an extended coma and suffering from residual brain injuries. After his accident the claimant was discharged from the military, and fired from several jobs for altercations with coworkers, being unable to understand a schedule, and not reporting to work on time. The Department of Veteran's Affairs found plaintiff was one hundred percent unemployable. *Ibid*. **at 997-8**. Multiple examining physicians found that the claimant had serious impairments regarding social judgment, following instructions, and interacting with others on the job, among other things. *Ibid*. **at 998-1000**.

The ALJ in *Young* found the claimant was moderately limited in his ability to carry out instructions, interact appropriately with the general public, set realistic goals, make plans independently of others, and respond to criticism from supervisors. However, his RFC failed to include any limitations regarding contact with supervisors. The Appeals Court found that the ALJ failed to explain how the

ALJ's determined limitations matched with his RFC assessment and therefore it could not stand. *Ibid.* **at 1003-5.**

The case at hand differs from Young in two important ways. First, plaintiff reported she had no problems with authority figures and she had never been fired from a job for not getting along with coworkers. (Tr. 209). Second, ALJ Sharrard did not find that plaintiff would have difficulty responding to supervisors. The lack of restrictions on dealing with supervisors was the primary problem with the ALJ's RFC assessment in *Young*, and is inapplicable in the case at hand. Further, ALJ Sharrard included the additional limitations of only occasional changes in the work setting for plaintiff's mental impairments, which is more than the ALJ in *Young* included in his RFC assessment.

Plaintiff also references *O'Connor-Spinner v. Astrue*, **627 F.3d 614.** The Appeals Court in *O'Connor-Spinner* found that moderate limitations with concentration, persistence, and pace were not sufficiently accounted for with the phrases "unskilled work" or "simple, repetitive tasks." Again, the case at hand differs. *Ibid.* **at 620.** ALJ Sharrad included the limitations of "simple, routine, and repetitive tasks in a low stress job with only occasional changes in the work setting" and "only brief and superficial interactions with co-workers and the general public." These limitations are significantly more restricting than those the ALJ put forth in *O'Connor-Spinner*. Additionally, ALJ Sharrard did not find plaintiff to have moderate difficulties with concentration, persistence, or pace which is what the Appeals Court focused on in *O'Connor-Spinner*.

Plaintiff broadly claims that additional limitations are supported by her medical record and then goes on to describe her treatment history relying primarily on her subjective complaints. As discussed above, the ALJ appropriately found that plaintiff's allegations were not entirely credible and therefore much of this argument is doomed from the outset.

ALJ Sharrard described, in detail, how she arrived at her RFC determination. She was limited to only brief and superficial interactions with co-workers and the general public because of her anxiety and panic attacks. The ALJ found plaintiff had mild difficulties with concentration, persistence, and pace due to her alleged problems with distraction and changes in routine. As a result, the ALJ limited her to simple, routine, and repetitive tasks in a low stress job with only occasional changes in the work setting. However, because plaintiff had stopped treatment in 2011, was no longer taking medication for anxiety and depression, and had not recently made any complaints regarding her mental health, the ALJ did not include any additional limitations. (Tr. 17, 20, 28).

Plaintiff fails to explain what additional mental limitations the ALJ should have included. She does not state how the ALJ's RFC was inadequate beyond stating she should have more limitations. "When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits." *Glenn v. Secretary of Health and Human Services*, **814 F.2d 387, 391 (7th Cir. 1987).**

Plaintiff's second argument regarding her RFC is that she had significant physical impairments that precluded work at the "light" level. She stated that her orthopedic and joint impairments caused chronic pain and she is unable to work in any capacity as a result. Again, she relies primarily on her own subjective complaints to support this limitation. The ALJ found that work at the light level was an adequate restriction based primarily on the objective evidence. She felt that plaintiff's diagnostic testing and physical examinations did not provide for greater limitations. (Tr. 21-5, 417-18, 435, 488-9, 557-8, 560-62).

The ALJ acknowledged plaintiff claimed to need crutches or a walker but concluded that was unsupported by the record. (Tr. 25). The ALJ stated that the assistive devices were never prescribed and no treatment notes indicate problems with low extremity strength. (Tr. 22-23, 25, 528-47). Additionally, neither plaintiff nor her mother indicated she needed an assistive device in her function reports. (Tr. 209, 224, 242, 30).

Plaintiff also argues that her skin condition requires a more restrictive RFC. However, again, she relies primarily on her subjective complains and fails to indicate which additional restrictions the ALJ should have included. The ALJ acknowledged that she had ongoing skin conditions which were severe and would require her to avoid even moderate exposure to extreme heat and cold. Additionally, the ALJ acknowledged that plaintiff's skin condition caused her to become anxious around others and included that in her reasoning for limiting her interactions with co-workers and the general public to superficial. (Tr. 25).

The Commissioner points out that the ALJ's entire RFC determination was supported by the state agency physicians on record. Dr. Brister concluded plaintiff had generally intact cognitive functioning, the ability to understand, recall, and execute simple operations of a routine, repetitive nature. She indicated plaintiff had moderate limitations in understanding, remembering, carrying out detailed instructions, and moderate social difficulties. Dr. Mehr affirmed this decision. Drs. Smith and Arjmand concluded that plaintiff did not have any "severe" impairments based on her medical record.

The ALJ found their opinions to be consistent with plaintiff's activities of daily living and supported by the record. She gave their opinions great weight. (Tr. 29-30). It is proper for the ALJ to rely upon the assessment of a state agency consultant. *Schmidt v. Barnhart*, **395 F.3d 737, 745 (7th Cir. 2005);** *Cass v. Shalala*, **8 F.3d 552, 555 (7th Cir. 1993).** "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." **Social Security Ruling 96-6p, at 2.** Here, the opinions of the state agency physicians provide sufficient support for ALJ Sharrard's RFC assessment.

In sum, none of plaintiff's arguments are persuasive. Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, **688**

**F.3d 306, 310 (7th Cir. 2012)**; *Elder v. Astrue*, **529 F.3d 408, 413 (7th Cir. 2008).** ALJ Sharrard's decision is supported by substantial evidence, and so must be affirmed.

### Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Sharrard committed no errors of law, and that her findings are supported by substantial evidence.   Accordingly, the final decision of the Commissioner of Social Security denying Jacqueline K. Williams's application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDRED.**

**DATE: December 30, 2014.**

**s/ Clifford J. Proud**

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**